# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| Board of Education of | ) | |
| Evanston-Skokie Community | ) | |
| Consolidated School District 65, | ) | No. 12 C 5073 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Judge Thomas M. Durkin |
| | ) | |
| D. Michael Risen, Illinois State Board | ) | |
| of Education, and L.J., by and | ) | |
| through his parents and next friends, | ) | |
| James J. and Melissa C., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

The Board of Education of Evanston-Skokie Community Consolidated School District 65 ("School District" or "District") brings this Individuals with Disabilities Education Act ("IDEA") suit, 20 U.S.C. § 1400 *et seq.*, against L.J. and his parents. The School District is appealing the outcome of a due process hearing after the impartial hearing officer, D. Michael Risen, found that the District failed to comply with the IDEA and awarded reimbursement for some of L.J.'s tuition costs at a private school.[1] Presently before the Court are the parties' cross-motions for summary judgment, R. 25, 35, and related briefing. R. 26, 29, 36, 39, 40, 49, 50, 51, 56. For the reasons set forth below, the Court grants in part and denies in part the District's motion for summary judgment and grants in part and denies in part L.J.'s

---

[1] The District originally named Risen and the Illinois State Board of Education ("ISBE") as defendants, but they were subsequently dismissed. R. 18.

parents' motion for summary judgment. In short, the Court affirms the impartial hearing officer's reimbursement award with the exception of the cost of L.J.'s tuition at The Cove School for the summer of 2011 and the cost of additional private services (beyond transportation to Cove) for the 2011-12 school year.

## Factual Background[2]

### 2003-06 (birth to age 3)

L.J. was born prematurely on April 27, 2003, at 24 weeks gestation. DSOF ¶ 7. He was hospitalized for more than three months, SD 300, and underwent numerous surgeries to his heart, lungs, eyes, and brain. DSOF ¶ 7.

Early on, it was apparent that L.J.'s premature birth would impair his development. From 2003 through 2006, L.J. received early intervention services from the State of Illinois. *Id.* ¶ 10. Beginning in infancy, L.J. struggled with sensory processing and was hypersensitive to noise, touch, and light. *Id.* ¶ 8. As a toddler, L.J. exhibited difficulties with visual and auditory distractibility and self-regulation. *Id.* ¶ 9. He was unable to focus on any task and engaged in disregulated behavior such as acting out, spitting, and lashing out violently. *Id.*

---

[2] The Court cites to Plaintiff's Statement of Material Facts, R. 29, as "PSOF ¶ __," Defendants' Response to Plaintiff's Statement of Material Facts, R. 40, as "DR ¶ __," Defendants' Statement of Material Facts, R. 39, as "DSOF ¶ __," Plaintiff's Response to Defendants' Statement of Material Facts, R. 49, as "PR ¶ __," and Plaintiff's Additional Statement of Material Facts, R. 50, as "PASOF ¶ __." The Court also cites to the School District's hearing documents as "SD__," L.J.'s parents' hearing documents as "A__" through "I__," the hearing officer's documents as "HO__," and the hearing itself as "--/--/-- Tr. at __."

**2006-08 (age 3 to 5)**

L.J. and his parents reside in Evanston, Illinois. PSOF ¶¶ 6-7. In 2006, as L.J. turned three, his parents brought him to the School District for evaluation. DSOF ¶ 10. In April 2006, the District conducted a special education eligibility evaluation and prepared an Individualized Education Program ("IEP"). SD299-318. The District described L.J.'s disabilities as mild delays in articulation abilities, gross motor delays, and educational delays in socialization, play, and self-care. SD302. It concluded that L.J. needed specialized instruction to address his deficit areas and gross motor needs and recommended "a small, structured, individualized program with low teacher:pupil ratio[]." *Id.* The District reached a similar conclusion in another IEP in April 2007: "a small, structured class with low teacher/student ratio is needed to support L.J.'s needs." C44.

From 2006 to 2008, L.J. attended the School District's half-day Services for Pre-Primary Aged Children Program ("SPPAC program"), which provided early childhood services in a small class with a low student-teacher ratio and individualized attention, as well as special education supports, services, and accommodations. DSOF ¶ 13. L.J. also received additional private speech and occupational therapy at parental expense on a weekly basis. *Id.* L.J.'s progress reports from his time at the SPPAC program document that he met or made expected progress toward all of his academic goals. *Id.* ¶ 14.

In addition to participating in the SPPAC program, L.J. also attended McGaw YMCA Children's Center, a hybrid preschool and daycare program, at

3

parental expense. *Id.* ¶ 15. Unlike the SPPAC program, the YMCA program had a larger classroom with 20 children. *Id.* L.J. struggled to self-regulate in the larger classroom setting—punching, biting, and kicking other children—and required an adult to stay with him at all times to keep him from disrupting the class. *Id.*

**2008-09 (age 5 to 6)**

In 2008, the School District reevaluated L.J. as he turned five and was age-eligible to attend kindergarten in the fall. DSOF ¶ 17. In a January 2008 IEP, the District again concluded that L.J. needed "specialized instruction" and "a small structured individualized program to address areas of need." C56. But in April 2008, the District proposed placing L.J. in an "inclusion" general education kindergarten classroom for 76% of the school day; L.J. would receive special education services for the remaining 24% of the day. C82. Although L.J.'s neighborhood school was Lincoln Elementary ("Lincoln"), the District proposed that L.J. attend Dewey Elementary ("Dewey"). 2/3/12 Tr. at 93.

L.J.'s parents ultimately decided to delay kindergarten for a year on the advice of L.J.'s doctors, including Dr. Alan Rosenblatt, his neurodevelopmental pediatrician, and Dr. Sharon Johnson, his psychologist. DSOF ¶ 17. The consensus among L.J.'s private providers was that he was not developmentally, academically, or socially ready to perform with other children his age. 2/3/12 Tr. at 93-94.

Instead, L.J.'s parents enrolled him full-time in the YMCA preschool for the 2008-09 school year at their expense. DSOF ¶ 17. L.J.'s parents selected the YMCA program because they felt it was a positive, loving environment, he had made some

4

progress and some friendships there, and the YMCA had an open-door policy that allowed L.J.'s mother to be present to help L.J. 2/3/12 Tr. at 96. During that year, L.J. continued to receive private speech and occupational therapy, and received additional social-work services, including from a School District social worker. DSOF ¶ 18. L.J. continued to experience difficulties at the YMCA program. As L.J.'s father testified, "He would act out. He would again still sometime[s] exhibit signs of violence. He would overreact, and misread his peers' cues, facial cues and speaking cues. He didn't understand them." 4/26/12 Tr. at 267-68.

**2009-11 (age 6 to 8)**

For the 2009-10 school year, L.J.'s parents did not approach the School District. PSOF ¶ 16. Instead, they enrolled L.J. in kindergarten at Baker Demonstration School ("Baker"), a private school located in Wilmette, Illinois. DSOF ¶ 19. Baker does not hold itself out as a special education provider but still accepts students with disabilities. 3/14/12 Tr. at 28-29. L.J.'s parents chose Baker because of its smaller class sizes (approximately 15 students), low student-teacher ratio, individualized teaching approach, and what they perceived as a "great feeling of overall acceptance of children who had difficulties." DSOF ¶¶ 19, 22. L.J.'s parents wanted to replicate many of the District's recommendations from its January 2008 IEP in the small school setting that Baker provided. *Id.* ¶ 23.

At Baker, L.J. was educated alongside his regularly-functioning classmates. Although Baker, as a private school, does not develop formal IEPs, PSOF ¶ 18, it does formulate educational plans for special needs students and allows private

providers to come into the school to provide additional support services. DR ¶ 18. L.J. continued to receive private speech and occupational therapy at Baker and was treated by an outside behavioral specialist and other doctors. DSOF ¶ 24. L.J. made some progress and had a generally positive experience in kindergarten, but also continued to show developmental delays and often got into verbal or physical confrontations with other children. DSOF ¶ 25; PR ¶ 25.

Based on L.J.'s kindergarten experience, his parents chose to have him continue at Baker for first grade for the 2010-11 school year. DSOF ¶ 25. For first grade, Baker implemented an educational plan for L.J. that included 11 classroom interventions and 26 accommodations. *Id.* ¶ 27. The accommodations included one-on-one instruction when possible, modified assignments, tailored direction, frequent movement breaks, frequent verbal and visual cues, preferential seating, and transition strategies. *Id.* With the educational plan in place, L.J.'s first grade teacher began the school year "optimistic and delighted." *Id.* ¶ 28.

Unfortunately, L.J.'s classroom behavior and academic performance significantly and progressively deteriorated. *Id.* ¶ 26; PSOF ¶¶ 23-24. In the first few months, L.J. was falling behind in reading and math, struggling in art and drama, exhibiting anger and aggression, and disrupting the classroom. DSOF ¶¶ 26, 28-29. By early 2011, L.J. had increasing difficulties with self-regulation, impulsivity, and attention, and the academic, social, and behavioral gaps between L.J. and his classmates widened. *Id.* ¶ 31. Even though L.J. was a year older than his classmates after he was held back a year, he struggled academically, would call

himself "stupid," and even threatened to kill himself. *Id.* ¶ 32. Baker and L.J.'s

parents tried various additional strategies and interventions to help L.J.—including

a private, in-school reading tutor—all to no avail. *Id.* ¶ 35.

In February 2011, Baker's staff informed L.J.'s parents that L.J.'s needs

exceeded Baker's resources and that the parents would need to find an alternative

second grade placement. *Id.* ¶ 36. Baker's staff recommended locating another

school that also offered small class sizes, but in a specialized environment with

teachers highly trained in special education. 2/3/12 Tr. at 111. L.J.'s parents

immediately thought of returning L.J. to the School District. *Id.*

**2011-12 (age 8 to 9)**

In February or early March 2011, L.J.'s mother informed the School District

of her intent to register L.J. for second grade in the fall and requested that the

District begin the case study evaluation process. DSOF ¶ 37; 2/3/12 Tr. at 112. The

District initially told L.J.'s mother that Wilmette District 39 was responsible for

evaluating L.J. because Baker—where L.J. was enrolled at the time—is located in

Wilmette. DSOF ¶ 38. Baker then reached out to Wilmette District 39 on L.J.'s

behalf, but Wilmette District 39 told Baker that the District—where L.J. resides—

was responsible for the evaluation. G92 ¶ 10. Over the next few weeks, there was

more back and forth over which district would evaluate L.J. for special education

services. DSOF ¶ 39. L.J.'s parents ultimately pressed ahead with the District

because L.J. would attend school in the District in the fall and the District was not

required to follow Wilmette District 39's recommendations in any event. *Id.*

Around the same time, L.J.'s parents enrolled him in summer classes at The Cove School ("Cove"), a private school located in Northbrook, Illinois that specializes in providing special education services to children with learning disabilities. L.J.'s father initiated the process by emailing Cove on March 25, 2011, F1, and submitted an application and $200 deposit later in April. G87. L.J.'s parents enrolled him at Cove for the summer to help him "catch up" and facilitate his ability to function successfully in the School District in the fall. DSOF ¶ 42. L.J.'s parents never sought to enroll L.J. in the District's summer program.

In April, L.J.'s mother attempted to register L.J. in the School District for the fall but the District turned her away. *Id.* ¶ 40. She returned on May 9 and successfully registered L.J. *Id.*[3] The same day, she met with the District and explained that L.J. would need an evaluation and IEP. *Id.* ¶ 41. The District agreed that it would perform an evaluation and develop an IEP, but initially indicated that the evaluation would have to wait until the District could observe L.J. in the classroom that fall. *Id.* After L.J.'s mother objected to the timing, the District agreed to expedite L.J.'s evaluation over the summer. *Id.*

In early June, the School District asked L.J.'s parents to have Baker's staff complete "Tier II" and "Tier III" assessment forms in preparation for L.J.'s evaluation by the District. *Id.* ¶ 43. L.J.'s parents returned the completed forms on June 23. *Id.* ¶ 44. Notably, Baker's staff concluded that L.J. "is unable to benefit

---

[3] At the hearing and in their briefs, the parties sometimes say that the registration occurred on May 5. Because there is no material difference, the Court will generally use May 9 unless quoting a document that refers to May 5.

from and attend to general education classroom instruction" due to "Combined Receptive/Expressive Language disorder/Language processing; Difficulties with Working Memory; Self regulation/attention/Impulsivity." *Id.* ¶ 46.

On July 6, the School District advised L.J.'s parents that it forwarded the completed assessment forms to Lincoln, L.J.'s "home school" in the District, and advised Lincoln that L.J.'s "[p]arents have requested a case study evaluation as soon as possible." DSOF ¶ 47; G11-12.

A month passed with no apparent activity. On August 3, L.J.'s father wrote to the School District for an update. DSOF ¶ 50. The Superintendent responded by apologizing for the delay and indicating that he would "make sure that you receive a communication in the near future." *Id.*

On August 5, after receiving no further response, L.J.'s parents submitted an application to Cove for the 2011-12 school year along with a $75 application fee. DSOF ¶ 53. L.J.'s parents applied to Cove as a "plan B" in case the School District's IEP was not ready by the start of the school year. *Id.* ¶ 52. The first day of classes in the District was August 29. PSOF ¶ 55.

On August 6, the School District emailed L.J.'s parents and suggested that there was "some confusion regarding when the case study evaluation assessments will take place." G17. Although the District had previously agreed to perform L.J.'s evaluation over the summer, DSOF ¶ 41, PR ¶ 41, the District at that point told L.J.'s parents that "we will need to schedule a . . . meeting as soon as the Team returns in the fall" and that L.J. would be "place[d] . . . in the inclusion class so he

will receive support while the Team is completing the case study evaluation." G17. The same day, the District instructed Lincoln to "[p]lease make sure that you have L.J. . . . in the inclusion class for second grade. We will be starting an evaluation that the parents requested in June." G18. (It is not clear why the District thought that L.J.'s parents only requested an evaluation in June.)

L.J.'s parents were not pleased with this development. On August 8, L.J.'s father notified the School District in writing that "effective August 24, 2011, and contingent upon his admission there, we will unilaterally enroll L.J. . . . at The Cove School, a private school, at public expense." DSOF ¶ 57; G19. He explained that "[w]e . . . do not believe that the placement at Lincoln . . . will provide him with a free appropriate public education because he has not been provided with a timely or appropriate IEP. . . . [W]e believe that his proposed placement, services, and methodology are not appropriate or sufficient." G19.

This notice got the School District's attention. On August 9, the District proposed a meeting with the IEP team for August 17 or 19. G21. By August 11, the parties had settled on an August 19 meeting date. G22. At that point, the District mistakenly told L.J.'s parents that they still needed to register L.J. before an evaluation could occur. G23. L.J.'s parents, of course, had already registered L.J. on May 9. After clearing up that confusion, the District informed L.J.'s parents that the evaluation would follow during the week of August 22. G22.

On August 19, L.J.'s parents met with the IEP team at the School District. DSOF ¶ 59. The same day, L.J.'s parents provided the District with copies of private

evaluations from 11 different professionals. *Id*. ¶ 60. Among those evaluations, L.J.'s psychologist, Dr. Johnson, recommended that L.J. receive "small class instruction" with specialized programs in reading, math, speech, and word retrieval. *Id*. ¶ 63. L.J.'s occupational therapist, Alexis Printen, noted L.J.'s prior classroom difficulties and similarly recommended a small class size with "a comprehensive support team that includes additional adults in the classroom, occupational therapy collaboration, and a low student to teacher ratio (ideally three students to one teacher)." *Id*. ¶ 62. On August 23, L.J.'s parents brought him to Lincoln for evaluations by District staff and were themselves interviewed. *Id*. ¶ 66.

On August 24, while the District was completing its evaluation, L.J. began attending classes at Cove. *Id*. ¶ 67. L.J.'s parents nonetheless kept their options open. Cove had prepared a contract requiring L.J.'s parents to pay a deposit of $8,750 and another $29,250 by September 15. PSOF ¶ 53; G129-30. Although L.J. began attending Cove on August 24, L.J.'s parents did not sign the contract or make any payments until September 19. PSOF ¶ 53; DR ¶ 53; G128.

On August 26, three days before the start of school in the District, L.J.'s parents met with the IEP team. Although the District did not provide a written IEP until September 6, the parties discussed the District's evaluation and proposed placement for L.J. PSOF ¶ 54; DR ¶ 54; DSOF ¶¶ 69, 100; PR ¶ 100. The District's evaluation corroborated L.J.'s learning disabilities in reading and math, language impairments, delayed academic functioning, and attention deficit hyperactivity disorder. DSOF ¶ 70. The District acknowledged that L.J. "has delayed skills in all

academic areas" and "continues to struggle in all academic areas even after he has received special education services since he was young." *Id.* The District also concluded, however, that L.J.'s behavior did not impede his learning or the learning of others and did not propose behavior interventions. C121.

The District proposed placing L.J. in an inclusion second grade classroom at Lincoln. PSOF ¶ 29. The inclusion class consisted of 15 or 16 students without disabilities and five students with disabilities. DSOF ¶ 75. The class was staffed by a full-time general education teacher, a part-time special education teacher, and an aide when the special education teacher was not present. PSOF ¶¶ 29-30, 75; DSOF ¶ 79. The District proposed that L.J. would spend 95% of his time in the inclusion classroom, with 90 minutes per week outside the classroom for speech and social work services. C131-32. In the classroom, L.J. would receive 600 minutes per week of reading/language special education instruction and another 150 minutes per week of math. PSOF ¶ 30. The special education teacher works with the students in a small group, and if necessary, can take a student to her office for instruction, which is set up like a classroom. PSOF ¶ 31. In total, about half of L.J.'s time would be spent receiving special education instruction. C132. The District also offered to hire a full time aide dedicated to L.J. PSOF ¶ 30; DR ¶ 30.

The District's decision to place L.J. in an inclusion second grade classroom was guided at least in part by an "Inclusion Policy" adopted by the District in or around 2009. DSOF ¶ 87; I1-36. The policy is based on principles such as "[a]ll students will be given the opportunity for meaningful participation and engagement

in the general education curriculum" and "[a] continuum of services and supports should reflect intensity of supports and not a separate place." I4. The policy therefore announces a strategy to "[a]ssign all students with disabilities to a general education classroom." DSOF ¶ 87; I25. In practice, the policy has led the District to cut back on the availability of self-contained special education classrooms. For the 2011-12 school year, Lincoln did not have a self-contained special education classroom for K-2 children with specific learning disabilities, although Lincoln did still have a self-contained classroom for autistic students. DSOF ¶¶ 88, 90. Dewey, another elementary school in the District, did have a self-contained classroom that included students with learning disabilities. DSOF ¶ 88; PR ¶ 88.

On September 2, L.J.'s parents visited Lincoln's inclusion second grade classroom to observe the District's proposed placement. DSOF ¶ 96. During their visit, L.J.'s parents observed what they perceived as a large classroom with noise and visual clutter with a teacher lecturing from the front of the room. *Id.* ¶ 97. L.J.'s parents also observed students pairing off in small groups to read to one another. *Id.* L.J.'s parents were concerned that the classroom was inappropriate for L.J. and that he could not function there. *Id.* ¶ 98. L.J.'s private providers similarly believed that L.J.'s presence in a regular education class would be detrimental, as he would become disregulated, would have difficulty engaging with the curriculum, would have difficulty with social interaction, and that he was aware of these issues and would likely react to his sense of being different, *id.* ¶ 99, as he had when he was educated alongside non-disabled students at Baker.

13

On September 19, L.J.'s parents executed the contract with Cove and paid the $38,000 tuition for the 2011-12 school year. DSOF ¶ 101. L.J. completed the 2011-12 school year at Cove, and also attended Cove during the summer of 2012. Cove's program provided small group self-contained special education instruction on all academic topics. *Id.* ¶ 103. L.J. was educated in a classroom with ten students, a teacher, and at least one assistant, and also met with speech and language pathologists, occupational therapists, and social workers. *Id.* ¶¶ 104-06; PR ¶ 104-06. Cove also provided direct instruction to address L.J.'s functioning and attention problems and his class had a special sound system that allowed the students to hear the teacher but deadened background noise. DSOF ¶ 108.

There is no dispute that L.J. made significant progress at Cove. He progressed in many academic areas, including reading and math. By March 2012, he met all of the benchmarks from the District's August 26, 2011 IEP and six of the benchmarks from the three goals added by Cove in October 2011. DSOF ¶ 110; PR ¶ 110. L.J.'s psychologist, Dr. Johnson, testified that L.J. "made great gains really across all areas" and that she saw "his self-confidence increasing, and therefore he [was] just very motivated, very intentional about his work and doing a very good job in the classroom." DSOF ¶ 111. L.J.'s father testified that L.J. "exhibited much greater ability to not only make friends, which he could always do, but keep them, which he couldn't; and he's built some relationships of the sort that he has never had at Baker or any other place." *Id.* ¶ 112. According to his parents, L.J.'s self-esteem has improved and "he's just a much different kid." *Id.* ¶ 113. As his mother

testified, "To use L.J.'s words, L.J. says Cove is the right match for me. He is with peers that he feels comfortable with. Everyone is sort of in the same boat. His self-esteem is through the roof. He's reading. There's no discussion of I want to die or nobody likes me or I'm different. . . . He has made friends. He's happy. I haven't seen him this happy for a really long time." 2/3/12 Tr. at 163-64.

## Procedural Background

Pursuant to 20 U.S.C. § 1415(b)(6)-(7) and 105 ILCS 5/14-8.02(a), L.J.'s parents requested a due process hearing to challenge the School District's proposed placement for the 2011-12 school year and seek reimbursement for the cost of sending L.J. to Cove. In their request, L.J.'s parents alleged that the District committed seven procedural and substantive IDEA violations:

(1)   Failure to conduct necessary academic and functional evaluations and to give meaningful consideration to independent evaluations provided by the parents;

(2)   Failure to conduct a functional behavioral analysis and develop an appropriate behavior intervention plan;

(3)   Failure to use scientifically based methodology;

(4)   Failure to provide L.J. an appropriate IEP;

(5)   Failure to provide L.J. with a timely IEP;

(6)   Failure to provide L.J. with an appropriate placement; and

(7)   Failure to provide a FAPE [Free Appropriate Public Education] to L.J. due to the substantive and procedural violations.

G38-40. As a remedy, L.J.'s parents sought reimbursement for tuition and related transportation expenses to Cove for the 2011-12 school year and for the summer of

2012 (also known as extended school year or "ESY" services). L.J.'s parents also wanted the option of enrolling L.J. at Cove for the 2012-13 school year, at the District's expense, if they and Cove agreed it was still appropriate.

At the due process hearing, the parties called twelve witnesses over the course of eight full days of testimony. In particular, the parties called: (1) L.J.'s mother; (2) L.J.'s father; (3) Dr. Johnson, L.J.'s private psychologist; (4) Terri Nitahara, Head Teacher at Baker; (5) Joyce Bartz, Director of Special Education for the School District; (6) Margaret Krulee, a second grade teacher at the District; (7) Fran Chana, a second grade inclusion special education teacher at the District; (8) Lyn Wilkins, a school psychologist at the District; (9) Alexis Printen, L.J.'s private occupational therapist; (10) Dr. Andrea Victor, a pediatric clinical psychologist who evaluated L.J.; (11) Dr. Robin Johnstone, Cove's principal; and (12) Ai Hoshino, a speech and language pathologist for the District.

On June 8, 2012, the hearing officer issued a 33-page written decision. The hearing officer found that the School District violated the IDEA in six of the seven ways alleged by L.J.'s parents (finding for the District only on issue three, that it used scientifically based methodology).[4] The hearing officer ordered that the District reimburse L.J.'s parents for tuition and related expenses at Cove for the 2011-12 school year and the summers of 2011 and 2012. The hearing officer denied

---

[4] As the hearing officer acknowledged, Findings ¶ 45, there is a fair amount of overlap among the seven "issues" originally identified by L.J.'s parents. In reviewing the six remaining "issues" below, the Court will cover the matters at issue in logical order but will not attempt to analyze each remaining "issue" in isolation.

L.J.'s parents' request for another full year at Cove at the District's expense for 2012-13, but ordered the District to convene an IEP team no later than July 15, 2012 to appropriately plan L.J.'s services for the 2012-13 school year.

The School District appealed the hearing officer's decision. Neither side asked to submit additional evidence here. The District therefore seeks review based solely on the administrative record that was developed at the due process hearing.

## Legal Standard

The IDEA provides that a court reviewing the outcome of a due process hearing "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). When neither party submits additional evidence, a summary judgment motion "is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record." *Hunger v. Leininger*, 15 F.3d 664, 669 (7th Cir. 1994). Thus, "despite being faced with cross motions for summary judgment, this Court's decision must be based on the preponderance of the evidence, and not on whether there are any genuine issues of material fact." *James D. v. Bd. of Educ.*, 642 F. Supp. 2d 804, 814 (N.D. Ill. 2009) (citing *Todd v. Duneland Sch. Corp.*, 299 F.3d 899, 904 (7th Cir. 2002)).

The party challenging the hearing officer's decision—in this case the School District—bears the burden of proof. *Heather S. v. State of Wisconsin*, 125 F.3d 1045, 1052 (7th Cir. 1997). It is also well-settled that "because courts do not have special

expertise in the area of educational policy, they must give 'due weight' to the results of the administrative decisions and should not substitute 'their own notions of sound educational policy for those of the school authorities which they review.'" *Bd. of Educ. of Murphysboro Cmty. Unit Sch. Dist. No. 186 v. Ill. St. Bd. of Educ.*, 41 F.3d 1162, 1166 (7th Cir. 1994) (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982)). This is especially true when the parties rest on the administrative record that was before the hearing officer. "[W]here the district court does not take new evidence. . ., it owes considerable deference to the hearing officer, and may set aside the administrative order only if it is strongly convinced that the order is erroneous. This level of review is akin to the standards of clear error or substantial evidence." *Alex R. v. Forrestville Valley Cmty. Unit Sch. Dist. #221*, 375 F.3d 603, 612 (7th Cir. 2004) (quotation and citation omitted). *See also Dale M. v. Bd. of Educ.*, 237 F.3d 813, 815 (7th Cir. 2001) ("[T]he fact that [the court] disagrees with the [hearing] officer is not enough to justify setting aside the latter's order; [the court] must be strongly convinced that the order is erroneous.").

A court must still independently review the testimony and evidence presented at the due process hearing, *Heather S.*, 125 F.3d at 1053, and review any questions of law *de novo. Alex R.*, 375 F.3d at 612. The Court does so here, while giving "due weight" to the hearing officer's findings.

The School District argues that the hearing officer's decision "deserves little deference" because he purportedly "at best, exhibit[ed] a total lack of knowledge of basic special education law, or at worst, bias favoring handicapping [sic] children

18

and their parents." R. 26 at 10. To support this allegation, the District relies on one

excerpt from the eight-day hearing where the hearing officer stated:

> I think the whole process here is about what is best for
> the student within the context of what is required under
> federal and state statutes and appropriate case law.
>
> But I think we still all have to keep in mind and keep ever
> present what's best for the student and in the end that's
> what I have to decide within that context.

*Id.* at 9 (quoting 3/15/12 Tr. at 53).

Viewed in context, this statement does not suggest that the hearing officer

was unknowledgeable or biased. Based on the Court's review of the entire record, it

is readily apparent that the hearing became overly heated at times, especially

between counsel. During this particular exchange while a witness was testifying,

the hearing officer was simply suggesting that counsel refrain from personal

attacks, reminding them that a child's education is at stake. In this very quote, the

hearing officer affirmed that he would do "what is required under federal and state

statutes and appropriate case law," and moments later, made clear that "I also am

trying to make sure that both sides – after all is said and done, that both sides get a

chance to be heard." 3/15/12 Tr. at 53. Later in the hearing, after finding that the

School District's counsel had falsely accused L.J.'s parents and their counsel of

perjury (an issue that the District does not raise here), the hearing officer again

made clear that "nothing either attorney has said during these proceedings has

unduly or improperly influenced me or otherwise compromised my impartiality in

this process." 4/27/12 Tr. at 4-10. The hearing officer is an experienced educator

duly appointed by the ISBE, 105 ILCS 5/14-8.02a(f-5), -8.02c,[5] and the District has not identified any basis for concluding that his findings should receive less deference than otherwise required.

## Analysis

The IDEA requires states receiving federal funding to ensure that a free appropriate public education ("FAPE") "is available to all children with disabilities residing in the State between the ages of 3 and 21, inclusive." 20 U.S.C. § 1412(a)(1)(A); *see also Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 232 (2009). Illinois law, in turn, generally delegates the duty to provide a FAPE to the school district where a student resides. *E.g.,* 105 ILCS 5/14-1.08, -4.01 (requiring local school boards to establish and maintain special education facilities and services for children with disabilities residing within the school district).

The IDEA imposes both procedural and substantive requirements. Courts therefore conduct a "twofold" inquiry under the IDEA. *Rowley*, 458 U.S. at 206-07. First, a court considers whether the school district complied with the IDEA's procedural mandates. *Id.* at 206. A procedural violation can support a finding that a child did not receive a FAPE if the procedural inadequacy "(I) impeded the child's right to a free appropriate public education; (II) significantly impeded the parents'

---

[5] Mr. Risen teaches graduate school courses in Special Education Law and American Public School Law, among other subjects, and is a long-time school administrator. He served 15 years as a principal in East Peoria Elementary District #86, 2 years as Superintendent of Schools of Green Valley CC District #695, 7 years as Superintendent of Schools at Midwest Central Community Unit District #191, and 6 years as Superintendent of Byron CUSD #226. *See* http://www.isbe.state.il.us/spec-ed/pdfs/dp_hearing_officers.pdf

opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or (III) caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii); *see also James D.*, 642 F. Supp. 2d at 816. Second, a court considers whether the IEP "developed through the Act's procedures [is] reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207; *see also Murphysboro*, 41 F.3d at 1166. "An IEP is reasonably calculated to confer educational benefit when it is 'likely to produce progress, not regression or trivial educational advancement.'" *James D.*, 642 F. Supp. 2d at 816 (quoting *Alex R.*, 375 F.3d at 615).

The Court addresses the procedural and substantive violations found by the hearing officer below. After that, the Court addresses the appropriateness of the private placement at Cove, the equitable factors that the School District argues cut against a reimbursement award, and finally some remaining issues involving the scope of the hearing officer's reimbursement award.

## I. Procedural Issues

### A. Timeliness of Evaluation and IEP

Under the IDEA, an initial evaluation must be conducted "within 60 days of receiving parental consent for the evaluation, or, if the State establishes a timeframe within which the evaluation must be conducted, within such timeframe." 20 U.S.C. § 1414(a)(1)(C)(i)(I); 34 C.F.R. § 300.301(c)(1)(i)-(ii). An initial evaluation has two components: determining whether a child has disabilities and, if so, determining the child's educational needs and developing an IEP. 20 U.S.C. §§

21

1414(a)(1)(C)(i), (b)(2)(A)(i)-(ii); 34 C.F.R. § 300.304(b)(1)(i)-(ii). An IEP ultimately must be in effect at the beginning of each school year. *Id.* § 300.323(a).

Illinois has established its own timeframe for conducting initial evaluations and therefore provides the governing standard:

> The determination of eligibility shall be made and the IEP meeting shall be completed within 60 school days from the date of written parental consent. In those instances when written parental consent is obtained with fewer than 60 pupil attendance days left in the school year, the eligibility determination shall be made and the IEP meeting shall be completed prior to the first day of the following school year.

105 ILCS 5/14-8.02(b). *See also* 23 Ill. Admin. Code § 226.110 ("Consent for the initial evaluation shall be obtained in conformance with the requirements of 34 CFR 300.300."); 34 C.F.R. § 300.300(a)(1)(iii) ("The public agency must make reasonable efforts to obtain the informed consent from the parent for an initial evaluation. . . ."); *id.* § 300.309(c) ("The public agency must promptly request parental consent to evaluate the child to determine if the child needs special education and related services.").

The hearing officer found that the School District's obligations were triggered by March 1, 2011, and that as a result, an IEP should have been in place by June 4, 2011, 60 school days later. Findings ¶ 42. By March 1, 2011, according to the hearing officer, L.J.'s parents had informed the District of their intention to enroll L.J. for second grade in the fall and requested an evaluation. Although L.J.'s parents did not provide written consent at that time, the hearing officer found that the District improperly deflected their requests. Thus, the hearing officer concluded

22

that the District committed a procedural violation of the IDEA by failing to provide a timely evaluation and IEP for the 2011-12 school year.

The School District raises two challenges to these findings. First, the District challenges the hearing officer's use of March 1, 2011 as the trigger date for its evaluation obligations and argues that L.J.'s parents did not request an IEP until May 9, 2011. By that time, the District argues, there were fewer than 60 school days left in the school year, which would extend the deadline for completing the IEP meeting to any time before the first day of the next school year.[6]

To challenge the March 1, 2011 trigger date, the School District relies on a pre-hearing affidavit submitted by L.J.'s mother. G90-99. Although L.J.'s mother testified at the hearing that she told the District in February or March 2011 that "I needed to register him and that he needed an IEP," 2/3/12 Tr. at 112, the District argues that her pre-hearing affidavit "clearly states that the first date she requested an IEP from the School District was May 5, 2011." R. 26 at 37. In that affidavit, L.J.'s mother stated that she called the District in February or early March 2011 "in order to begin the case study evaluation process." G92 ¶ 9. L.J.'s mother also stated that when she successfully registered L.J. on May 5, 2011, she "indicated to the woman [at the desk] that L.J. would need an IEP" and told another individual that "L.J. would need an IEP." G93 ¶ 12.

---

[6] The District does not take issue with starting the clock in the absence of written parental consent, as Illinois law generally requires. As noted above, 34 C.F.R. §§ 300.300(a)(1)(iii) and 300.309(c) require that a public agency make prompt, reasonable efforts to obtain parental consent. Thus, in their briefs, both parties focus on when L.J.'s parents sufficiently requested an evaluation and IEP.

The School District's argument is unavailing. As an initial matter, L.J.'s mother's affidavit never says (clearly or otherwise) that May 5, 2011 was the first time she requested an IEP. Notably, the affidavit never describes what she actually *told* the District when she called in February or early March 2011; it says only that the *purpose* of the call was "to begin the case study evaluation process." As a result, the affidavit is not inconsistent with L.J.'s mother's hearing testimony that she requested an IEP. "[T]his is not a situation where a [party] has directly contradicted her own earlier statements. . . . There is no inherent inconsistency between the affidavit and the [hearing testimony]." *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1314 n.3 (7th Cir. 1989) (quotations and citations omitted).

L.J.'s mother's testimony also was not the only evidence supporting a March 1, 2011 trigger date. Teresa Nitahara of Baker testified that she too had asked the District in early March "if they would do a case study evaluation and write an IEP." 3/14/12 Tr. at 91-92. Nitahara's testimony is itself corroborated by an email she wrote to L.J.'s parents on March 7, 2011, which makes clear that she was discussing an IEP with the District and Wilmette District 39 at that time. G5, 3/7/11 email ("I am waiting for District 39 to contact me. I have asked them to confirm their roles and procedures regarding eligibility and IEPs. As soon as I hear back from them, I will call Patty Seifer [at the School District], then you."). The record therefore contains ample evidence that L.J.'s parents—both directly and through Baker—had requested by early March 2011 that the District prepare an IEP.

24

In any event, the distinction that the District attempts to draw between requesting a "case study evaluation" as opposed to an IEP is a distinction without a difference. The District does not cite any authority requiring that a parent specifically request an IEP. To the contrary, the IDEA expressly provides that a parent "may initiate a request for an initial evaluation," 20 U.S.C. § 1414(a)(1)(B) and 34 C.F.R. § 300.301(b), which then includes *both* an eligibility determination and, if appropriate, the development of an IEP. 20 U.S.C. § 1414(b)(2)(A)(i)-(ii); 34 C.F.R. § 300.304(b)(1)(i)-(ii). As a result, even if all L.J.'s mother said on her initial call was that she wanted to "begin the case study evaluation process," that process, by definition, includes and culminates in an IEP. Indeed, L.J.'s mother would have done exactly what 20 U.S.C. § 1414(a)(1)(B) and 34 C.F.R. § 300.301(b) instructed her to do—initiated a request for an initial evaluation. As a result, the District has not established that the hearing officer erred by selecting March 1, 2011 as the date when the District should have commenced an evaluation.

Second, the School District challenges the hearing officer's finding that it improperly deflected L.J.'s parents' evaluation request. The District argues that Wilmette District 39, the school district where L.J.'s private school was located, was required to perform the evaluation. The District's argument is based on the IDEA's "child find" requirements, which generally provide that each local educational agency ("LEA") "must locate, identify, and evaluate all children with disabilities who are enrolled by their parents in private . . . schools located in the school district served by the LEA." 34 C.F.R. § 300.131(a). L.J.'s parents respond, and the hearing

officer found, that Wilmette District 39's "child find" obligations do not override the School District's own duties to provide a FAPE when residents of the District seek to register their child and request an evaluation.

The parties each cite guidance documents from the ISBE and the Office of Special Education and Rehabilitation Services ("OSERS") in the U.S. Department of Education to support their respective positions. The School District cites an ISBE guidance document from 2006 which explains that:

> Beginning with the 2006-07 school year . . . the serving district [the district where the student's private school is located] will have the responsibility for conducting all eligibility conferences for parentally-placed non-public school students regardless of the residency of the students.

ISBE Supplemental Guidance Information to Memorandum #05-7 (Apr. 21, 2006).

L.J.'s parents cite an OSERS guidance document from 2009 which addressed a scenario where a student resided in Maryland but attended private school in the District of Columbia. OSERS explained that:

> [P]arents can request that their child be evaluated by the [LEA] of residence for purposes of having a [FAPE] made available to the child and by the LEA in which the private school is located for purposes of considering the child for equitable services. . . .
>
>         \*        \*        \*
>
> If a parent requests that the LEA responsible for providing FAPE to the child evaluate their child for the purpose of having a program of FAPE made available to the child, the LEA cannot refuse to conduct the evaluation and determine the child's eligibility for FAPE because the child attends a private school in another LEA.

26

OSERS, Letter to Michael J. Eig (Jan. 28, 2009).

The School District and L.J.'s parents also each cite an OSERS question and answer document from 2011. Three provisions are relevant here:

Question B-1:

Which LEA is responsible for conducting child find for parentally placed private school children?

Answer:

Under 34 CFR § 300.131, the LEA where the private school is located is responsible for conducting child find for parentally placed private school children. The child find requirements for parentally placed children make clear that the LEA . . . must conduct a thorough and complete child find process to determine the number of parentally placed children with disabilities attending private schools *located in the LEA.* (Under the prior provisions of the IDEA, the responsibility to conduct child find for parentally placed private school children rested with *the LEA in which the children resided.)*

Question B-4:

Is it possible for a parent to request evaluations from the LEA where the private school is located as well as the district where the child resides?

Answer:

The Department recognizes that there could be times when parents request that their parentally placed child be evaluated by different LEAs if the child is attending a private school that is not in the LEA in which the child resides. For example, because most States generally assign the responsibility for making FAPE available to the LEA in which the child's parents reside, and because that could be an LEA that is different from the LEA in which the child's private school is located, parents could ask two different LEAs to evaluate their child for different purposes at the same time. . . .

27

*     *     *

Although the Department discourages parents from requesting evaluations from two LEAs, if the parent chooses to request evaluations from the LEA responsible for providing the child FAPE and from another LEA that is responsible for considering the child for the provision of equitable services, both LEAs are required to conduct an evaluation.

Question B-8:

What are the LEA's responsibilities for reevaluations of parentally placed children?

The LEA where the private . . . school is located is responsible for conducting reevaluations of children with disabilities enrolled by their parents in the private . . . schools located in the LEA.

Questions and Answers on Serving Children with Disabilities Placed by Their Parents in Private Schools (revised April 2011) (emphasis in original).

There are two key takeaways from these guidance documents, which are not inconsistent. First, when parents enroll their child in private school outside their district of residence, the IDEA's "child find" requirements apply to the school district where the private school is located. Thus, absent any further action by the child's parents, the district where the private school is located must locate, identify, and evaluate the child and all other children with disabilities enrolled in private schools located within the district. Second, if the child's parents want their child to return to the public school district where they reside, and request that the district provide the child with a FAPE, the district is required to evaluate the child. In other

words, the district of residence is not required to go out and "find" the child, but when a child's parent approaches the district, it must respond.

This reading of the IDEA is fully consistent with the holdings of other courts. *See, e.g., J.S. v. Scarsdale Union Free Sch. Dist.*, 826 F. Supp. 2d 635, 664-68 (S.D.N.Y. 2011) (addressing "what happens when . . . parents who have privately placed their child seek a FAPE from the district in which the parents continue to reside" and holding that "a district-of-residence's obligations do not simply end because a child has been privately placed elsewhere"); *Moorestown Twp. Bd. of Educ. v. S.D.*, 811 F. Supp. 2d 1057, 1067-70 (D.N.J. 2011) ("[W]here parents request reevaluations of their child for purposes of having an offer of a FAPE made for him, and the child is domiciled in the district, the school district must comply."); *District of Columbia v. Abramson*, 493 F. Supp. 2d 80, 84-86 (D.D.C. 2007) (holding that "the child find process does not prevent a parent from initiating a request for an initial evaluation from the LEA of residence or relieve the LEA where the child resides from the obligation to provide an evaluation"). The School District never addresses these cases and provides no case law to the contrary. Indeed, other than falling back on the IDEA's general "child find" requirements, the District never attempts to explain the interplay between the "child find" requirements and their own obligations as the district where L.J. and his parents reside.

The Court also notes that Illinois law specifically protects families if districts disagree over who is responsible for an evaluation. *See* 23 Ill. Admin. Code § 226.50(b) ("Each school district is responsible for ensuring that no eligible child for

whom services are sought is denied FAPE due to jurisdictional disputes among Illinois agencies."). As a result, the momentary dispute between the School District and Wilmette District 39 in March 2011 ultimately cannot excuse the District's failure to timely evaluate L.J. to ensure that he would receive a FAPE.

As a result, the hearing officer correctly concluded that Wilmette District 39's "child find" obligations did not relieve the School District of its own obligations after L.J.'s parents requested that the District evaluate L.J. for the purpose of having a FAPE made available to him. The District violated 34 C.F.R. § 300.301(c)(1)(ii) and 105 ILCS 5/14-8.02(b) (and arguably 23 Ill. Admin. Code § 226.50(b)) by failing to complete the IEP meeting within 60 school days from the date L.J.'s parents attempted to initiate that process in February or early March 2011.[7]

## B. Failure to Conduct A Functional Behavioral Analysis Or Develop A Behavioral Intervention Plan

The IDEA requires that as part of the IEP process, a school district must "in the case of a child whose behavior impedes the child's learning or that of others, consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior." 20 U.S.C. § 1414(d)(3)(B)(i); 34 C.F.R. § 300.324(a)(2)(i). The Seventh Circuit has therefore made clear that "an IEP must respond to all significant facets of a child's disability, both academic and behavioral." *Alex R.*, 375 F.3d at 613. *See also* 20 U.S.C. § 1414(b)(3)(B) (a child

---

[7] Because it is undisputed that an early March 2011 trigger date left the District with enough time to complete the IEP meeting before the summer, whether the District eventually completed the IEP meeting before or after the first day of school on August 29, 2011 (which the parties also dispute) is immaterial.

must be assessed "in all areas of suspected disability"); 23 Ill. Admin. Code 226.230(b) (an IEP must include a functional behavioral analysis and behavioral intervention plan, where appropriate); *Long v. District of Columbia*, 780 F. Supp. 2d 49, 61 (D.D.C. 2011) ("'[T]he IDEA . . . recognizes that the quality of a child's education is inextricably linked to that child's behavior,' and '[a functional behavioral analysis] is essential to addressing a child's behavioral difficulties, and, as such, it plays an integral role in the development of an IEP.'") (quoting *Harris v. District of Columbia*, 561 F. Supp. 2d 63, 67-68 (D.D.C. 2008)).

The parties' dispute on this issue focuses on the scope of information that a school district should consider in assessing a child's behavior. The hearing officer found that the School District failed to perform a proper functional behavioral analysis when it concluded in its August 26, 2011 IEP that L.J.'s behavior did not impede his learning or the learning of others, despite a long history of behavior problems at other schools. Findings ¶ 43. The District's position, then and now, is that because L.J. had not attended District schools for the prior three years, there was no evidence that his behavior would impede his learning or the learning of others in its inclusion second grade classroom. Instead of considering reports based on L.J.'s behavior at prior schools, the District intended to wait and observe L.J.'s behavior once he was in the District's inclusion second grade classroom. *E.g.,* R. 51 at 10 ("The School District's IEP team indicated that since [L.J.] had not attended its schools for 3 years, they wanted to wait until he actually attended the proposed placement to ascertain if his behavior would impact his learning.").

31

The School District does not cite any authority allowing it to disregard L.J.'s well-documented behavioral issues at prior schools and instead wait to see how he behaved at a District school.[8] Indeed, the District's approach is at odds with the IDEA in several key respects. First, the IDEA requires that school districts have a child's IEP in place at the beginning of each school year. 34 C.F.R. § 300.323(a). Deferring an integral part of the IEP until after the start of the school year would undermine the IDEA's timing requirements. *E.g., R.E. v. New York City Dept. of Educ.*, 694 F.3d 167, 191 (2d Cir. 2012) (explaining that a functional behavioral analysis or "FBA" "must be conducted in advance to ensure that the IEP is based on adequate information" and that "the sole value of the FBA is to assist in the drafting of the IEP. Therefore the failure to conduct an FBA at the proper time cannot be rectified by doing so at a later date.").

Second, the IDEA instructs school districts to consider a wide array of information in developing a child's IEP. For example, a district must "review existing evaluation data on the child," including "(i) evaluations and information provided by the parents of the child; (ii) current classroom-based, local, or State assessments, and classroom-based observations; and (iii) observations by teachers and related service providers." 20 U.S.C. § 1414(c)(1)(A). Information from prior schools certainly seems to qualify as "existing evaluation data"; the IDEA does not contain a specific carve-out for data from prior schools. The IDEA also requires that

---

[8] In *Park Hill Sch. Dist. v. Dass*, 655 F.3d 762, 767 (8th Cir. 2011), the one case that the District does cite, the IEPs "noted D.D.'s and K.D.'s individual behavioral issues [from prior schools], as well as other limitations and concerns, reflecting that the IEP team had considered strategies to 'address that behavior.'"

districts "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information," and that districts cannot use "any single measure or assessment as the sole criterion for . . . determining an appropriate educational program for the child." *Id.* § 1414(b)(2)(A)-(B). The District's insistence that it could only gauge L.J.'s behavior through direct observation in its own classroom certainly seems to run afoul of these requirements. And finally, the IDEA provides that when a child transfers mid-year, districts must ensure that assessments "are coordinated with [the child's] prior and subsequent schools, as necessary and as expeditiously as possible, to ensure prompt completion of full evaluations." *Id.* § 1414(b)(3)(D). Although this provision is directed to mid-year transfers, it seems highly unlikely in light of section 1414(c)(1)(A) that Congress believed that a school district could ignore existing evaluation data when a child switches schools before the start of the school year.

Contrary to the School District's argument, there was ample evidence in existence before August 26, 2011 that L.J.'s behavior would impede his learning or the learning of others. L.J.'s behavior was an issue as a toddler in the State's early intervention program and remained an issue through his time in the District's SPPAC program and then at the YMCA and Baker. These behavioral issues were well-documented and known to the District in 2011. The District even asked L.J.'s parents to have Baker complete various assessment forms, but then disregarded Baker's responses when it nonetheless concluded that L.J.'s behavior did not impede his learning or the learning of others. The District's conclusion cannot be

reconciled with L.J.'s history, especially since he had just left Baker due in large part to behavioral issues in his first grade classroom. As a result, the hearing officer correctly found that the District failed to perform a proper functional behavioral analysis and develop a behavioral intervention plan.

## C.    Independent Evaluations

As one of its procedural protections, the IDEA provides parents the right to obtain an independent educational evaluation of their child, at public expense if necessary. 34 C.F.R. § 300.502(a)-(b). These independent evaluations "[m]ust be considered by the public agency, if it meets agency criteria, in any decision made with respect to the provision of FAPE to the child." *Id.* § 300.502(c)(1).

L.J.'s parents presented the School District with independent evaluations from 11 different professionals. The hearing officer found that the District did not adequately consider the evaluations when it formulated L.J.'s IEP. The hearing officer reasoned that the District did not explain in its IEP why it rejected and failed to include many of the suggestions, and that "[a]bsent at least some explanation in the IEP suggesting the District found the [independent evaluation] results to be inaccurate, unnecessary or inappropriate, the [hearing officer] must conclude the District failed to consider the [independent evaluations] when developing the Student's August 26, 2011 IEP." Findings ¶ 42.

The School District correctly notes that § 300.502(c)(1) establishes a relatively low bar for compliance. As another court in this district recently observed, "[w]hile the IDEA requires that school districts consider the results of independent

34

educational evaluations obtained by parents, 34 C.F.R. § 300.502(c)(1), the federal regulations do not require 'that there be substantive discussion of' such evaluations." *James D.*, 642 F. Supp. 2d at 818 (quoting *G.D. v. Westmoreland Sch. Dist.*, 930 F.2d 942, 947 (1st Cir. 1991)). The regulations also do not require a school district to "assign a specific weight to any item of information presented to it for its consideration. . . . The plain meaning of the word 'consider' is 'to reflect on: think about with a degree of care or caution.'" *T.S. v. Bd. of Educ.*, 10 F.3d 87, 89 (2d Cir. 1993) (quoting Webster's Third New International Dictionary 483 (1986)). *See also Michael P. v. Dep't of Educ.*, 656 F.3d 1057, 1066 n.9 (9th Cir. 2011) ("IDEA only requires a school district to consider the results of a parent-initiated evaluation; it does not require a school district to adopt the conclusions of such an evaluation."); *Evans v. Dist. No. 17*, 841 F.2d 824, 830 (8th Cir. 1988) (explaining that the school district "only had to 'consider' the evaluation" provided by the parents).

The Court therefore agrees that the hearing officer relied too heavily on the District's failure to substantively discuss the independent evaluations in its IEP. And by then concluding that the lack of substantive discussion required a finding that the District failed to consider the evaluations, the hearing officer seemingly misapplied the burden of proof, which at the hearing rested with L.J.'s parents, not the District. *Schaffer v. Weast*, 546 U.S. 49, 51 (2005). The hearing officer could not reasonably conclude that the District failed to consider the independent evaluations simply because the evaluations were not discussed in the IEP.

But the question remains—did the School District fail to actually consider the independent evaluations? Based on the Court's independent review, the record does not contain sufficient evidence to support a finding that the District violated § 300.502(c)(1). Indeed, the gravamen of L.J.'s parents' complaint on this procedural issue is not that the District failed to review the evaluations, but that "many of the needs and recommendations identified by the outside evaluations were ignored without explanation or justification." R. 36 at 49.[9] This argument ultimately seeks to expand the duties actually imposed by § 300.502(c)(1). As long as the District genuinely considered the evaluations, the District is not prohibited from disregarding particular recommendations without explanation. Providing an explanation might be good practice, but § 300.502(c)(1) does not require it.

In *B.H. v. W. Clermont Bd. of Educ.*, 788 F. Supp. 2d 682, 694 (S.D. Ohio 2011), the only case cited by L.J.'s parents, the court found that the school district violated § 300.502(c)(1) because the school's principal "acknowledged and admitted that the letters and evaluations she received were not considered at the IEP meetings" and because a speech pathologist testified that the district never provided her with several of the student's outside evaluations. These facts are different from the case at hand, where the dispute is not whether the School District reviewed the

---

[9] Notably, in each example where L.J.'s parents argue that the School District ignored their independent evaluations, they concede that the District did at least review the evaluations. R. 36 at 49 ("For example, prior to evaluating [L.J.] on August 23, 2011, Ms. Gilmore, the district's [occupational therapist], reviewed the private [occupational therapist] evaluation conducted on August 5, 2011 by Alexis Printen."); *id.* at 50 ("Similarly, Ms. Wilkins, the district psychologist, reviewed Dr. Johnson's June 2010 report and Dr. Victor's January 2011 report.").

reports, but only whether it gave them enough credence. Unlike in *B.H.*, the record here does not support a finding that the District violated § 300.502(c)(1).

Ultimately, however, this error is harmless and does not affect the outcome in this case. The other procedural and substantive violations that the School District did commit readily support a finding that it denied L.J. a FAPE.

## II. Substantive Issues

After eight days of testimony, the hearing officer found that the School District's proposed placement of L.J. in an inclusion second grade classroom was not reasonably calculated to provide L.J. with educational benefits.

The School District challenges that finding based largely on two core IDEA principles, neither of which is in dispute. First, the IDEA guarantees only a "basic floor of opportunity" with particularized instruction designed "to confer some educational benefit," not "every special service necessary to maximize each handicapped child's potential." *Rowley*, 458 U.S. at 199-200. In other words, the IDEA requires only "an appropriate education, not the best possible education, or the placement the parents prefer." *Heather S.*, 125 F.3d at 1057.

Second, the IDEA requires that school districts educate disabled children in the "least restrictive environment." Thus,

> To the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A). This requirement reflects a policy choice by Congress in favor of mainstreaming disabled children "to the maximum extent possible." *Id.* § 1400(c)(5)(A). *See also Beth B. v. Van Clay*, 282 F.3d 493, 498 (7th Cir. 2002).

Conversely, mainstreaming is not always appropriate. Thus, "[w]hile IDEA requires that children with disabilities be mainstreamed to the extent possible, it does not require their integration at the expense of other IDEA mandates, such as minimum educational opportunities." *Heather S.*, 125 F.3d at 1056-57. *See also Rowley*, 458 U.S. at 181 n. 4 ("Despite this preference for 'mainstreaming' . . . Congress recognized that regular classrooms simply would not be a suitable setting for the education of many handicapped children. . . . The Act thus provides for the education of some handicapped children in separate classes or institutional settings."); *Murphysboro*, 41 F.3d at 1168 ("[T]he mainstreaming requirement was developed in response to school districts which were reluctant to integrate mentally impaired children and their non-disabled peers. It was not developed to promote integration with non-disabled peers at the expense of other IDEA requirements and is applicable only if the IEP meets IDEA minimums."). As a result, school districts are ultimately required to "ensure that a continuum of alternative placements is available to meet the needs of children with disabilities for special education and related services." 34 C.F.R. § 300.115(a).

Based on these core principles, the School District argues at length that its proposed placement of L.J. for the 2011-12 school year was reasonably calculated to provide him with educational benefits in a mainstream environment. The District

touts the qualifications and practices of the general and special education teachers in Lincoln's inclusion second grade classroom and argues that its August 26, 2011 IEP adequately addressed L.J.'s specialized needs in reading and math. The District also attempts to downplay L.J.'s need for a small classroom and argues that the proposed placement would not have impeded other second grade students and was completely different from L.J.'s first grade classroom at Baker.

Over the course of the eight-day hearing, the School District submitted voluminous evidence to support its argument that its proposed placement was appropriate. L.J.'s parents, of course, also submitted voluminous evidence cutting the other way. The hearing officer considered all of that evidence and found for L.J.'s parents on this issue. "Whether an IEP was reasonably calculated to enable the child to receive educational benefits is a question of fact that we review for clear error." *Alex R.*, 375 F.3d at 615 (quotations and citations omitted). The Court has carefully reviewed the entire record and finds that the District has not carried its burden of showing either that the hearing officer applied the incorrect legal standard or that his finding on this issue is clearly erroneous.

In particular, the following evidence lends significant support to the hearing officer's conclusion that the District's proposed placement was not reasonably calculated to provide L.J. with educational benefits:

● As discussed above, the District, in its IEP, paid little if any attention to L.J.'s significant behavioral issues (based on its mistaken belief that there was no evidence that L.J.'s behavior would impede his learning or the learning of others).

Because L.J.'s behavioral issues have always been a central component of his disabilities, this deficiency alone could justify a finding that the IEP was substantively inadequate and failed to provide a FAPE.[10] But there is more.

● After L.J. experienced difficulties in Baker's first grade classroom, where he was educated alongside regularly-functioning students, Baker's staff opined—and told the District—that L.J. "is *unable to benefit* from and attend to general education classroom instruction." DSOF ¶ 46 (emphasis added). The District argues that the hearing officer placed too much weight on L.J.'s first grade experience and attempts to distinguish the accommodations that L.J. received at Baker from the supports he would have received in the District's inclusion second grade classroom. Although the placements certainly were not identical, it was perfectly appropriate for the hearing officer to rely on L.J.'s negative experience in first grade in rejecting a similar second grade placement.

● Up until the District's August 26, 2011 IEP, L.J.'s educators—including the District itself—had consistently concluded that L.J. needed small classes. In its April 2006 IEP, the District recommended "a small, structured, individualized program with low teacher:pupil ratio[]." SD302. In its April 2007 IEP, the District concluded that "a small, structured class with low teacher/student ratio is needed to support L.J.'s needs." C44. In its January 2008 IEP, the District

---

[10] Indeed, although the District acknowledges that "[t]he Seventh Circuit in *Alex R.*, 375 F.3d at 613, held that an IEP is substantially adequate so long as it responds to the significant facets of the student's disability, both academic *and behavioral*," R. 26 at 14 (emphasis added), the District then only claims that "Herein, the School District's IEP addressed L.J.'s reading and math disabilities." *Id.*

concluded that L.J. needed "specialized instruction" and "a small structured individualized program to address areas of need." C82. And then, of course, L.J. went on to struggle in the larger classroom settings at the YMCA and Baker. A child's educational needs can certainly change from one year to the next, which is why new IEPs are developed. But there is no evidence that L.J. suddenly improved to the point where he might achieve progress in an inclusion general education classroom; to the contrary, his most recent experience at Baker suggested otherwise. As in *Gellert v. D.C. Pub. Sch.*, 435 F. Supp. 2d 18, 27 (D.D.C. 2006), the District "fail[ed] to show [that L.J.] could receive FAPE without the specific accommodations of small class size and a quiet, calm learning environment."

● The evaluations provided to the District by L.J.'s parents, including from Dr. Johnson and Alexis Printen, similarly recommended a small class size. DSOF ¶¶ 60-63. The District again argues that the hearing officer placed too much weight on these evaluations, this time by attempting to flyspeck the extent of the evaluators' personal observations of L.J. in each classroom setting. But again, the hearing officer's reliance on these evaluations from L.J.'s private providers (along with other factors) was perfectly appropriate; the District has not identified any basis for concluding that the hearing officer's finding was clearly erroneous.

The hearing officer also cited substantial evidence that the District's proposed placement was predetermined. Findings ¶ 45. On August 6, the District decided that L.J. would begin the year in the inclusion second grade classroom while it completed its evaluation. Even if this placement was intended as

41

temporary, there was little evidence that other options were seriously considered when the District belatedly agreed to evaluate L.J. before school started.[11] The District's August 26, 2011 IEP discussed only the inclusion classroom and Cove. C133. And L.J.'s father testified that the District gave only perfunctory consideration to Cove at the August 26 meeting. 4/26/12 Tr. at 79-82. This testimony was largely corroborated by the District's own staff. Lyn Wilkins, a school psychologist for the District, testified that "[w]e would never choose an option that is not part of our district. We would feel that we can service our child – not never. We would – I'm sorry. We would feel that we can service our students in our district." 4/13/12 Tr. at 266. And although Ai Hoshino, a speech and language pathologist for the District, was familiar with Cove—he worked there before joining the District—he did not remember that Cove was even discussed. 4/27/12 Tr. at 237, 239.

The District's placement was also influenced by its "Inclusion Policy," which attempts to provide the required continuum of placements through "intensity of supports and not a separate place," I4, and adopts a strategy to "[a]ssign all students with disabilities to a general education classroom." I25. The inclusion policy, at least on its face, takes mainstreaming a step too far. As the Seventh Circuit has made clear, the IDEA requires "a continuum of program options which range from regular classrooms with supplementary aids to separate schools and residential facilities." *Murphysboro*, 41 F.3d at 1166. *See also Heather S.*, 125 F.3d

---

[11] The District's original plan clearly violated 34 C.F.R. § 300.323(a), which requires that an IEP be in effect at the start of the year.

at 1056 (same); 34 C.F.R. § 300.115(b)(1) ("The continuum required . . . must . . . [i]nclude the alternative placements listed in the definition of special education under § 300.38 (instruction in regular classes, special classes, special schools, home instruction, and instruction in hospitals and institutions).").[12] Although it appears that the District does not take its inclusion policy literally (the District does still offer at least some separate classes in some schools), the policy provides further evidence that the District's proposed placement was largely predetermined.

In short, L.J.'s parents submitted ample evidence to support the hearing officer's finding that the District's placement of L.J. in its inclusion second grade classroom failed to provide him with a FAPE. These substantive deficiencies also make clear that the procedural violations discussed above did in fact impede L.J.'s right to a FAPE and caused a deprivation of educational benefits.

## III. Appropriateness Of Placement At Cove

L.J.'s parents are required to establish not only that the District failed to provide a FAPE, but also that the private placement they selected was appropriate. *Forest Grove*, 557 U.S. at 232; *Carter*, 510 U.S. at 15. A private placement is generally appropriate if it is reasonably calculated to enable the child to receive

---

[12] Of course, this does not mean that every district is required to directly provide this full range of services or face liability for reimbursement claims. As the Supreme Court explained in *Florence Cnty. Sch. Dist. 4 v. Carter*, 510 U.S. 7, 16 (1993), "public educational authorities who want to avoid reimbursing parents for the private education of a disabled child can do one of two things: give the child a free appropriate public education in a public setting, or place the child in an appropriate private setting of the State's choice. This is the IDEA's mandate, and school officials who conform to it need not worry about reimbursement claims." Here, the District did not make any offer other than its inclusion second grade classroom.

educational benefits and "provides educational instruction specially designed to meet the unique needs of a handicapped child." *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 364-65 (2d Cir. 2006) (citations omitted).

There is little question that Cove was an appropriate private placement. Cove provided small group self-contained special education instruction that was designed to meet L.J.'s unique needs, and there is no dispute that L.J. has shown considerable progress at Cove. The School District only briefly addresses this issue. It primarily rehashes its argument that students with disabilities should be mainstreamed to the maximum extent possible and that Cove is not L.J.'s "least restrictive environment." R. 26 at 46-47. But as discussed above, although mainstreaming is the general preference, the hearing officer's conclusion that mainstreaming was not appropriate for L.J. is not clearly erroneous.

The District also cites *Schreiber v. E. Ramapo Cent. Sch. Dist.*, 700 F. Supp. 2d 529, 551 (S.D.N.Y. 2010), and *D.D-S. v. Southold Union Free Sch. Dist.*, 2011 WL 3919040, at *15 (E.D.N.Y. 2011), for the proposition that a private placement should be rejected when there is no indication that the placement would eventually transition the student into a less restrictive placement. But in each of these cases, the courts rejected private placements that were overly restrictive and unnecessary from the beginning. Thus, the courts were naturally concerned that the placements would hinder the students from returning to a more mainstream environment. Here, however, L.J.'s placement at Cove was not too restrictive for his needs, and he

has shown considerable progress at Cove. Cove therefore may have helped L.J. move closer to being able to benefit from less restrictive placements.

## IV.    Equitable Considerations

Equitable factors can also limit or preclude reimbursement. *E.g., Forest Grove*, 557 U.S. at 246-47 ("[C]ourts retain discretion to reduce the amount of a reimbursement award if the equities so warrant."); *Sch. Comm. of Burlington v. Dep't of Ed. of Mass*, 471 U.S. 359, 374 (1985) ("[E]quitable considerations are relevant in fashioning relief."). The School District raises two equitable arguments against reimbursement. The Court addresses each in turn.

### A.    Prior Placements

The District claims that L.J.'s parents stunted L.J.'s progress by enrolling him at the YMCA and Baker for the 2008-09, 2009-10, and 2010-11 school years. As a result, the District argues, L.J.'s parents should be denied reimbursement for L.J.'s tuition at Cove for the 2011-12 school year because they helped create the situation that made the private placement necessary.

In analyzing the equities, the Court is skeptical of relying on alleged parental negligence in private placements years earlier. The IDEA is quite clear that a FAPE must be made available "to *all* children with disabilities." 20 U.S.C. § 1412(1) (emphasis added); *see also Rowley*, 458 U.S. at 180-81. Thus, when L.J.'s parents registered him in the District for the 2011-12 school year, the District had an unequivocal duty to provide L.J. with a FAPE, regardless of L.J.'s history. And without a reimbursement remedy, a child's right to a FAPE "would be less than

45

complete." *Burlington*, 471 U.S. at 37. But under the District's theory, the District could essentially breach its duties without consequence based on alleged mistakes by L.J.'s parents years earlier. This result would undermine the IDEA's central purpose of ensuring that *all* children with disabilities receive a FAPE. A child should not lose the IDEA's protections any time a school district might have grounds to second-guess the parents' earlier placement decisions. Otherwise, one mistake years earlier could result in a child forever being left behind.

These concerns are particularly acute in a case like this where the District can only speculate that L.J. would have been better off if his parents had enrolled him in the District in 2008-09. As the District itself argues elsewhere in its briefs, R. 26 at 11, "[n]either the statute nor reason countenance 'Monday Morning Quarterbacking' in evaluating the appropriateness of a child's placement." *Thomson R2-J Sch. Dist. v. Luke P.*, 540 F.3d 1143, 1149 (10th Cir. 2008) (quoting *O'Toole v. Olathe Dist. Sch. Unified Sch. Dist. No. 233*, 144 F.3d 692, 701-02 (10th Cir. 1998)). But that is exactly what the District asks the Court to do. The Court cannot travel back in time and concoct an alternate history of where L.J. would be today if he had started kindergarten in the District in 2008-09 as opposed to being held back a year and then enrolled in private school. Moreover, the District's theory that L.J.'s parents caused his current deficits is inconsistent with its own August 26, 2011 IEP, which specifically denied that lack of appropriate instruction in reading and math were "determinate factors" for L.J.'s disability. C108.

To support its equitable argument, the School District relies almost exclusively on *Parents of Student W. v. Puyallup Sch. Dist. No. 3*, 31 F.3d 1489 (9th Cir. 1994), which it claims is "directly on point." The Court disagrees. In *Puyallup*, the Ninth Circuit affirmed the district court's denial of compensatory education[13] based on several factors. First, the student's parents had a history of declining or not even requesting special education services and, unlike here, did not make alternative arrangements for the student to receive services elsewhere. *Id.* at 1496-97. Thus, the district court was not asked to speculate as to whether the student would have fared better in one placement over another—the parents did not secure any alternative services for the student. Second, and perhaps more central to the outcome, the student graduated from high school on time without the additional education services belatedly sought by his parents. *Id.* at 1497. Not surprisingly, the district court therefore did not believe that a compensatory education award was appropriate. The Ninth Circuit concluded that "[i]t may be a rare case when compensatory education is not appropriate, but it was not an abuse of the district court's discretion to decide that this case was such a rarity." *Id.*[14]

---

[13] Unlike an award for reimbursement of past costs, a compensatory education award requires a school district to provide the student with future services to compensate for its past failure to provide a FAPE.

[14] In *Everett v. Santa Barbara High Sch. Dist.*, 28 Fed. Appx. 683, 685 (9th Cir. 2002), the Ninth Circuit itself distinguished *Puyallup*, explaining: "By contrast, this case is no such rarity. Unlike the parents in [*Puyallup*], Robert's parents repeatedly requested special education services. And also unlike [*Puyallup*], Robert neither graduated with his class nor was performing at grade level when he left school. We find these differences dispositive and therefore conclude that the District Court's

Although the Court has no way of knowing if L.J. would have fared better by starting kindergarten with the School District in 2008-09, the Court has carefully reviewed the reasonableness of L.J.'s parents' decisions for the 2008-09, 2009-10, and 2010-11 school years. *See* 20 U.S.C. § 1412(a)(10)(C)(iii)(III) ("The cost of reimbursement . . . may be reduced or denied . . . upon a judicial finding of unreasonableness with respect to actions taken by the parents."). Whether in hindsight the decisions paid off, the decisions were not unreasonable. On the advice of their team of private providers, L.J.'s parents decided that L.J. was not ready for kindergarten in 2008-09, enrolled him at the YMCA, and then attempted to implement many of the District's own proposals in the smaller classroom setting offered at Baker. In these circumstances, where the District apparently concedes that L.J.'s parents had "good intentions," R. 51 at 15, the equities do not support limiting reimbursement after the District failed to provide a FAPE years later for the 2011-12 school year. The District does not cite any precedent for limiting reimbursement because earlier private placements chosen by parents in good faith did not provide the benefits they had perhaps hoped.

## B.     Cooperation And Timely Notice

To be eligible for reimbursement, parents must allow a school district a reasonable opportunity to evaluate their child and cooperate in the placement process. *Patricia P. v. Bd. of Educ.*, 203 F.3d 462, 468-69 (7th Cir. 2000); 20 U.S.C. § 1412(a)(10)(C)(iii)(II). Parents are also required to provide 10-day written notice of

---

award of relief was within its discretion." Like *Everett*, the facts before this Court are very different from the rare facts faced in *Puyallup*.

their intent to enroll their child in private school at public expense. 20 U.S.C. § 1412(a)(10)(C)(iii)(I)(bb); *Forest Grove*, 557 U.S. at 247.

The School District argues that L.J.'s parents failed to cooperate and that their actions "clearly demonstrate that [they] determined that L.J. would attend Cove School without any intention of giving the School District's IEP a chance." R. 26 at 32. The hearing officer disagreed and found that L.J.'s parents cooperated with the District throughout. There is considerable evidence in the record to support the hearing officer's conclusion that L.J.'s parents cooperated. Indeed, the District's continued pursuit of this theory borders on the frivolous.

In sum, L.J.'s parents gave the District ample opportunity to evaluate L.J. and fulfill its obligations under the IDEA. L.J.'s parents first requested an evaluation in February or early March 2011, but met resistance from the District. Eventually, the District accepted L.J.'s registration on May 9 and agreed to perform an evaluation over the summer. But when nothing happened by August 5, L.J.'s parents began to make a contingency plan for L.J. to attend Cove. Then on August 6, citing "confusion," the District repudiated its agreement to evaluate L.J. over the summer and indicated that it would not have an IEP in place before the start of the school year, in violation of the IDEA. A few days later, the District also appeared to have misplaced L.J.'s registration materials.

Only then—after five months of delays by the District—did L.J.'s parents threaten to send L.J. to Cove at public expense for the 2011-12 school year. On August 8, L.J.'s father notified the District that they would unilaterally enroll L.J.

49

at Cove effective August 24 (complying with the 10-day notice requirement). L.J.'s parents each testified at length that even after the notice, they had not yet made a decision, were still hopeful that the District would provide an appropriate IEP, and would have sent L.J. to the District if an appropriate IEP was in place. 2/3/12 Tr. at 140-44, 162, 216-25; 4/27/12 Tr. at 45-51, 58-59, 114-18, 122-57, 179-80. The hearing officer found their testimony credible, as he was entitled to do.

The District argues that actions speak louder than words. The Court agrees, but this does not help the District. After sending the August 8 notice letter, L.J.'s parents: (i) met with the District on August 19; (ii) provided the District with copies of L.J.'s private evaluations; (iii) brought L.J. in for evaluations on August 23 and themselves sat for interviews; (iv) met with the District for several hours on August 26 to discuss the District's proposed placement; (v) observed the inclusion second grade classroom on September 2; and (vi) held off on signing the contract with Cove and paying Cove even the $8,750 deposit until September 19. None of these actions suggest that L.J.'s parents intended to have L.J. complete the 2011-12 school year at Cove all along, as the District claims.

Ultimately, the August 8 notice letter served its intended purpose: it allowed the District an opportunity to cure its IDEA violations, evaluate L.J. before the start of the school year as it was required to do, and provide a FAPE. The letter finally prompted some action, but unfortunately, it was too little, too late. There is no basis to deny reimbursement for lack of cooperation; L.J.'s parents allowed the

District repeated opportunities to evaluate L.J. If anything, L.J.'s parents exhibited extraordinary patience in dealing with the District.

## IV.     Reimbursement Award

The School District also challenges two particular aspects of the hearing officer's reimbursement award. R. 26 at 48. First, the hearing officer awarded reimbursement for the cost of L.J.'s tuition at Cove for the summer of 2011, Findings ¶ 49, apparently because "the District did not make an offer of ESY for the Student, nor did the District ask the parents why the Student was attending Cove School." *Id.* ¶ 12. The District argues that it had no responsibility to pay for L.J.'s placement at Cove during the summer of 2011 and that L.J.'s parents never provided the required 10 day notice for that placement.

L.J.'s parents do not address this issue in their briefs, and the Court cannot discern any basis from the record for this part of the reimbursement award. L.J.'s parents did not request reimbursement for L.J.'s tuition from the summer of 2011 in their September 19, 2011 due process hearing request, G38-41, or in their post-hearing memorandum. ISBE002544, 002588. Indeed, in one of the hearing officer's rulings on pre-hearing motions, he explained that L.J.'s parents had clarified that the relief sought was "limited to the current school year of 2011-2012, ESY of 2012 and the school year of 2012-13." HO472, Feb. 2, 2012 Ruling.

There is also no evidence that the District failed to fulfill any duty to provide a FAPE for ESY 2011. L.J. attended Baker for the 2010-11 school year and his parents never attempted to enroll him in the District for summer school. To the

contrary, L.J.'s parents enrolled him at Cove in late March, just as they were only beginning to reach out to the District for the 2011-12 school year. The Court is not aware of any legal duty on the part of the District to volunteer services where L.J.'s parents had not even asked for it and were apparently perfectly content to enroll L.J. at Cove for the summer at their own expense. As a result, the hearing officer erred by awarding reimbursement for summer school at Cove in 2011.

Second, as part of the reimbursement award for the 2011-12 school year, the hearing officer included the cost of additional services provided by L.J.'s parents in conjunction with the Cove placement. Findings ¶ 50. As examples, the hearing officer cited costs for speech and language therapy, occupational therapy, physical therapy, psychological services, social work services, and transportation costs. The District argues that L.J.'s parents never requested that relief in their hearing request. The District also argues that because the hearing officer found that Cove was an appropriate placement that would provide L.J. with educational benefits, an award covering additional private services is improper.

Again, L.J.'s parents do not address this issue in their briefs, and the grounds for awarding most of these costs are not clear. L.J.'s parents' hearing request did seek reimbursement for the cost of transporting L.J. to Cove, G40, and that cost is directly related to L.J.'s education at Cove. As a result, the hearing officer properly awarded those costs. But as the District correctly points out, L.J.'s parents' hearing request did not seek reimbursement for the costs of private providers like speech and language therapists, occupational therapists, physical therapists, psychologists,

or social workers, and L.J.'s parents make no effort to defend the award of those costs in this Court. As a result, the Court finds that the hearing officer erred by awarding reimbursement for the cost of additional private services (other than transportation to Cove) for the 2011-12 school year.

## Conclusion

The Court therefore grants in part and denies in part the District's motion for summary judgment, R. 25, and grants in part and denies in part L.J.'s parents' motion for summary judgment. R. 35. The Court affirms the impartial hearing officer's reimbursement award with the exception of the cost of L.J.'s tuition at Cove for the summer of 2011 and the cost of additional private services (beyond transportation to Cove) for the 2011-12 school year.

ENTERED:

Honorable Thomas M. Durkin
United States District Judge

Dated:  June 25, 2013